**THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **DR. DOMINIQUE RYON and** | * | **CIVIL ACTION NO. 3:08cv00333** |
| **DR. BENEDICTE MAUGUIÈRE** | * | |
| | * | |
| **VERSUS** | * | |
| | * | |
| **ELSIE BURKHALTER, WINFRED** | * | |
| **SIBILLE, WAYNE PARKER, PAUL** | * | **SECTION ________________________** |
| **AUCOIN, VICTOR BUSSIE, ANDRE** | * | |
| **COUDRAIN, DR. MILDRED GALLOT,** | * | |
| **JEFF JENKINS, RENEE LAPEYROLERIE,** | * | |
| **JIMMY LONG, SR., RUSSELL MOSELY,** | * | |
| **OLINDA RICARD, CONNIE ROUGEOU,** | * | **JUDGE __________________________** |
| **EUNICE SMITH, IN THEIR OFFICIAL** | * | |
| **CAPACITY AS MEMBERS OF THE BOARD** | * | |
| **OF SUPERVISORS FOR THE UNIVERSITY** | * | |
| **OF LOUISIANA SYSTEM, and FABRICE** | * | |
| **LEROY and ALLEN DAVID BARRY** | * | **MAGISTRATE JUDGE ___________** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, TEMPORARY RESTRAINING ORDER, AND DAMAGES**

Plaintiffs, Dr. Dominique Ryon and Dr. Benedicte Mauguière, both of the full age of majority, and domiciled in Lafayette, Lafayette Parish, Louisiana, through undersigned counsel, respectfully represent as follows:

## *I. INTRODUCTION*

1.

This is a proceeding for declaratory and injunctive relief and damages to redress the deprivation of rights secured to the plaintiffs by the First and Fourteenth Amendments to the United States Constitution, Art. I §§ 2 and 7 of the Louisiana Constitution and 42 U.S.C. § 1983.

## ***II. JURISDICTION***

2.

This Court has jurisdiction herein pursuant to 28 U.S.C.A. § 1343, as this is an action for declaratory and injunctive relief and damages arising from the Defendants' violations of First and Fourteenth Amendments to the United States Constitution, Art. I §§ 2 and 7 of the Louisiana Constitution and 42 U.S.C. § 1983. This Court has supplemental jurisdiction of the plaintiffs' state law claims under Art. I §§ 2 and 7 in accordance with 28 U.S.C. § 1967.

## ***III. VENUE***

3.

Venue is appropriate in the Untied States District Court for the Middle District of Louisiana, pursuant to 28 U.S.C.A. § 1391(b), in that the individual Board members, in their official capacities, are domiciled in this district (LSA-R.S. 17:3219).

## ***IV. PARTIES***

4.

The Plaintiffs, Ryon and Mauguière, are both presently employed by the University of Louisiana at Lafayette (hereinafter referred to as ULL) as tenured university professors. Dr. Ryon has been employed at ULL since May, 1995, and is an Associate Professor of French in the Department of Modern Languages. Dr. Ryon was tenured in 2001. Dr. Mauguière has been employed at ULL since May, 1990, and is a Full Professor of French in the Department of Modern Languages. Dr. Mauguière was tenured in 1995.

5.

Made Defendants herein are the following:

1. Elsie Burkhalter, Winfred Sibille, Wayne Parker, Paul Aucoin, Victor Bussie, Andre Coudrain, Dr. Mildred Gallot, Jeff Jenkins, Renee Lapeyrolerie, Jimmy Long, Sr.,

Russell Mosely, Olinda Ricard, Connie Rougeou, Eunice Smith, in their official capacities as members of the Board Of Supervisors For The University Of Louisiana System, all of whom are of the legal age of majority, and whose legal domicile is in Baton Rouge, East Baton Rouge Parish, Louisiana (collectively hereinafter the Board);

2. Allen David Barry, of the legal age of majority and domiciled in Lafayette, Louisiana, in his official and personal capacities; and

3. Fabrice Leroy, of the legal age of majority and domiciled in Lafayette, Louisiana, in his official and personal capacities.

## *V. STATEMENT OF FACTS*

6.

By letters to Plaintiffs' attorney, dated May 19, 2008, the Board, through Dr. Paula Phillips Carson (hereinafter Dr. Carson), Chair, Ad Hoc Hearing Committee (hereinafter AHHC), informed Plaintiffs that ULL has invoked formal dismissal proceedings to consider dismissing the Plaintiffs from their positions, deprive Plaintiffs of their tenure status and terminate their employment at ULL. Dr. Carson's letters further informed Plaintiffs that the dismissal hearing, to be held by the AHHC, would begin on June 9, 2008 (which, without prior notice to or agreement by Plaintiffs, was unilaterally later rescheduled by the AHHC to June 16, 2008).

7.

The Plaintiffs were originally informed by the ULL Faculty Grievance Committee (hereinafter the FGC) that their dismissals were proposed to be based on the Plaintiffs' alleged failure to adhere to the section of the ULL's Specifications for an "Ideal University Professor", which section is entitled "Citizenship and Service". A copy of the "Specifications" is attached hereto and made a part hereof as Exhibit 1.

8.

After Plaintiffs received the FGC's "Specifications" (referred to above), Plaintiffs made repeated requests to the FGC and other university officials for notice containing specific, detailed charges and information on which the FGC intends to rely with regard to the dismissal actions against Plaintiffs. The FGC, however, has repeatedly refused and failed to provide specific, detailed notice to Plaintiffs.

9.

In response to one of the requests by Plaintiffs' attorney for formal notice containing specific details on which Plaintiffs' proposed dismissals were to be based, Dr. Carson's May 19, 2008 letters merely referred Plaintiffs to the FGC's March 25, 2008 Statement of Jointly Formulated Grounds for Proposed Dismissal for Cause of Dr. Dominique Ryon and Dr. Benedicte Mauguière, which are based on the complaints of Ms. Salima Benzohra and Monique Michel. Copies of the FGC's March 25, 2008 "Statements" are attached hereto and made a part hereof as Exhibit 2.

10.

The Specifications for an "Ideal University Professor" (Exhibit 1), and Dr. Carson's May 19, 2008 letter and attachments (Exhibit 3) are the only formal notice of their proposed dismissals the Plaintiffs have ever received.

11.

The FGC's March 25, 2008 "Statements" indicate that Plaintiffs' dismissals are based on alleged violations, with vague, unspecific and conclusory examples included in each. The "charges" in these "Statements" are as follows:

DR. DOMINIQUE RYON (Complaints of Salima Benzohra and Monique Michel):

A. Administrative Service. The ideal faculty member is a model citizen of the academic Community. (p. V – 8)

B. Public and professional service. Faculty members should have a strong sense of moral values and ethics and their personal conduct and professional activities should be such that the students and colleagues recognize them as professionals in the highest sense of the term. (p.V8)

C. *AAUP Statement on Professional Ethics*. Standards of professional behavior by professors (Paragraphs 1 and 2 of Document IV, Appendix A, p. IV-1)

D. Paragraphs A, B, C, D and E of Document XI of the *University Policy Regarding Sexual behavior and Sexual Harassment* (Appendix A pp. XI-1-2)

E. Non-reappointment provisions of Tenured Academic Appointment policy – Failure to follow orders (p. V – 5)

DR. BENEDICTE MAUGUIÈRE (Complaints of Salima Benzohra and Monique Michel):

A. Administrative Service. The ideal faculty member is a model citizen of the academic Community. (p. V – 8)

B. Public and professional service. Faculty members should have a strong sense of moral values and ethics and their personal conduct and professional activities should be such that the students and colleagues recognize them as professionals in the highest sense of the term. (p.V8)

C. *AAUP Statement on Professional Ethics*. Standards of professional behavior by professors (Paragraphs 1 and 2 of Document IV, Appendix A, p. IV-1)

D. Paragraphs A, B, C, D and E of Document XI of the *University Policy Regarding Sexual behavior and Sexual Harassment* (Appendix A pp. XI-1-2)

E. Sanctions paragraph of Document XV *State of Louisiana Employee Substance Abuse and Drug Free Workplace Policy* (p.XV-6).

Paragraph E. regarding Dr. Mauguière relates to the complaint of Salima Benzohra only. The relevant portions of the referenced documents are attached hereto and made a part hereof as Exhibit 4.

## *VI. STATEMENT OF CLAIMS*

## *COUNT I*

## *RETALIATION AGAINST PLAINTIFFS*

12.

On or about September 20, 2003, the Plaintiffs filed a grievance with the Faculty Grievance Committee of the University of Louisiana at Lafayette regarding the actions of Dr. Fabrice Leroy, Dr. David Barry and Dr. Barry Ancelet. This grievance raised a number of serious and important issues of public concern including, without limitation, the following:

(a) The unprecedented granting of early tenure and promotion to Dr. Fabrice Leroy, after he was in his position for only one (1) semester;

(b) Dr. Leroy's proposed promotion to the position of Chairman of the Department of Modern Languages following the exclusion of Dr. Mauguiere as a potential candidate (resulting in an election process with a unique candidate), although she had remarkable academic achievements, outstanding teaching evaluations, and many years of dedication and service to the University; that Dr. Leroy was a young man, in his early thirties, who had had no previous experience in a department with a PhD program; and that the Plaintiffs reasonably believed at the time that Dr. Leroy was promoted without the creation of a bona fide search committee to consider other potential candidates in accordance with University guidelines;

(c) Various unprofessional, uncollegial practices, which, in the process of this nomination, had been used to exclude Dr. Mauguiere from consideration;

(d) During the Fall and Spring of 2003, Dr. Leroy became increasingly hostile,

verbally abusive and sarcastic with Dr. Mauguiere and Dr. Catherine Perry, the President of CIEF;

(e) Dr. Leroy putting his own professional enhancement before the general interest of the Department of Modern Languages;

(f) Dr. Leroy's signing and sending of a severely critical letter seeking the immediate removal of Dr. Benedicte Mauguiere, Dr. Jack Yeager (who at the time was the Associate Chair of the French Department at Louisiana State University), and Dr. Ryon as officers (Executive Director, Vice-President and Secretary Treasurer, respectively) of the CIEF, which was then based at University of Louisiana at Lafayette, and the replacement of Doctors Mauguiere, Yeager and Ryon with two of the authors of the petition, one of whom was the Defendant Leroy. As early as February 24, 2003, the Board of Directors of CIEF concluded that all of the accusations contained in this letter were groundless and had been distorted and fabricated to harm the Plaintiffs' reputations. The authors of this letter were asked by the CIEF Board of Directors to apologize to Dr. Mauguiere. Dr. Leroy refused to do so.

The Plaintiffs' grievance also alleges other matters of public concern, including:

(a) That Dr. Barry Ancelet, in concert with Dr. David Barry and Dr. Fabrice Leroy, actively distributed Dr. Leroy's letter to the Plaintiffs' faculty colleagues after it had been rejected by the Board of Directors of CIEF, but without disclosing to the Plaintiffs' colleagues that the letter had been determined to be groundless, and without providing Dr. Mauguiere's letter of rebuttal, in a deliberate effort to alienate the Plaintiffs' colleagues and turn

them against the Plaintiffs;

(b) Regarding the University administration maintaining a "glass ceiling" for promotions within the Department of Modern Languages, and restricting consideration of the applicants for the position of Chair of the Department to a very narrow sociological profile (i.e. white males who were married with children);

(c) An allegation about Dr. Leroy's fabrication of various allegations of professional misconduct, which were designed to discredit Dr. Mauguiere's professional reputation and prevent Dr. Mauguiere from becoming Chair of the Department, to remove her as Executive Director of CIEF, and advance the Defendants' positions in academic politics of the ULL Department of Modern Languages so that Dr. Leroy would become department Chair;

(d) That the selection of the new Chair of the Department should be made on the basis of merit factors, such as who has the skills to lead the Department effectively and productively in an atmosphere free of threats, harassment, and hostility, and who would not perpetuate existing problems within the Department, especially since there is no term limit.

(e) The denial of the Plaintiffs' rights to academic freedom by directives to the Plaintiffs not to discuss with their colleagues the subject matter of the Plaintiffs' grievances, while the Defendants were speaking freely with their colleagues about these same matters.

13.

Prior to the filing of the aforesaid grievance, the Defendants, Leroy and Ancelet had some

professional jealousies against the Plaintiffs, but they were within what would typically be expected among highly intelligent and opinionated academics working in the same field. The Plaintiffs were highly regarded and respected by the Defendants, as illustrated by the following examples:

a. On April 3, 2000, Dr. Ancelet, while he was Head of the Department of Modern Languages, supported Dr. Ryon's appointment to the administrative position of Graduate Studies Coordinator, noting that "Dr. Ryon has an excellent rapport with graduate students".

b. On March 7, 2001, Dr. Ancelet, while he was Chairman of the Department of Modern Languages, wrote Dr. Barry supporting granting Dr. Ryon tenure and her promotion to the position of Associate Professor;

c. On April 3, 2001, Dr. Ancelet signed an evaluation and promotion recommendation which included the following comments:

   1. Teaching – "outstanding"

   2. Research – "excellent"

   3. Administrative Service – "outstanding"

   4. Public & Professional Service – "outstanding"

c. On March 5, 2001, the Department Personnel Committee wrote Chairman Ancelet, supporting Dr. Ryon's tenure and noting that her publications have been outstanding scholarly contributions and that she is "an excellent teacher at all levels."

d. On November 8, 2001, Dr. Ancelet wrote to Dean Barry supporting Dr. Ryon for an endowed professorship in Francophone Studies.

e. On November 8, 2001, Dr. Ancelet wrote Dean Barry also supporting Dr. Mauguiere for another endowed professorship.

f. On November 13, 2001, Dr. Ancelet again wrote recommending Dr. Mauguiere for a UL Lafayette Foundation Distinguished Professor Award.

g. On December 6, 2001, Dean Barry informed Dr. Mauguiere that she was nominated for the UL Lafayette Foundation Distinguished Professor Award, and wrote concurring with Dr. Ancelet's November 13, 2001 recommendation that "this honor is amply justified by your [Dr. Mauguiere's] academic, professional and service record at the university."

h. On November 13, 2001, Dr. Ancelet wrote to Dean Barry regarding Dr. Mauguiere's nomination for a University Foundation Distinguished Professor Award. He described Dr. Mauguiere, in his own words, as "an internationally recognized scholar", "Dr. Mauguiere's research record is outstanding," her "many accomplishments bring a great deal of visibility and recognition to our institution, as well as herself," she is an "invaluable colleague," "she is deeply devoted to this university and to the success of our Francophone Studies program," she is a "fine example of the ideal professor," she is an "inspiration for her graduate students."

14.

Between November of 2001 and February of 2003, there were no significant changes in the quality or quantity of the Plaintiffs' teaching or research or in the Plaintiffs' personalities, abilities, or skills.

15.

However, since the Plaintiffs' filing of the grievance on September 30, 2003, the Defendants, Barry and Leroy, together with Dr. Ancelet, have subjected the Plaintiffs to a vicious and continuous campaign of retaliation and a pattern of materially adverse actions designed to destroy the Plaintiffs'

personal and professional reputations and secure their terminations. The culmination of this campaign has been the initiation and advancement of the bogus sexual harassment charges against the Plaintiffs. This retaliation has included, without limitation, the following:

(a) While the ***September 30, 2003*** grievance was pending, Dr. Leroy taped a comic strip to his office door. The comic strip's story involved an employee and his boss and it ridiculed the grievance process.

(b) On ***February 2, 2004***, Dean Barry requested in a letter to the Vice-President of the University that "punitive actions" be taken against the Plaintiffs, based on the findings of the Grievance Committee which heard the September 20, 2003 grievance. These actions included excluding the Plaintiffs from consideration for merit pay increases for 1-3 years and a request for immediate removal of Dr. Mauguiere's endowed professorship. As a result, the Plaintiffs' merit pay increases have been adversely affected since 2004, causing the Plaintiffs to suffer significant financial losses.

(c) In the ***Spring 2004***, Dr. Mauguiere was passed over for promotion to the position of Chair of the Department of Modern Languages, although she had expressed her interest in the position and she was the highest ranking senior faculty member in the Department;

(d) On or about ***February 11, 2004***, Dr. Mauguiere and Dr. Ryon received a low Merit Category (III) in their 2003 Annual Performance evaluation despite an excellent level of professional and academic achievements in 2003. In the case of Dr. Mauguiere, as acknowledged by Dr. Ancelet in his letter dated March 10, 2004 "the lowest of her fourteen-year career here". Dr. Mauguiere and Dr. Ryon

appealed these negative performance evaluations. In their appeals, both Dr. Mauguiere and Dr. Ryon raised concerns about the unusual procedure used that year for these performance evaluations, and their concerns about retaliation and bias in their evaluations.

(e) On ***March 10, 2004***, following Dr. Mauguiere's appeal which set forth references to the Defendants' retaliation, Dr. Ancelet wrote Dean Barry "I find myself wondering how long Dr. Mauguiere's own demonstrably unprofessional, uncollegial, insubordinate and intimidating behavior should be tolerated without serious consequences". In the same March 10, 2004 letter, Dr. Ancelet explicitly criticized the number of complaints that Dr. Mauguiere had filed and stated his umbrage over the content of the Plaintiffs' September 20, 2003 grievance. Dr. Ancelet criticized the Plaintiffs "for attempting to affect organizational and institutional policy" by their grievance and other expressions to the administration of the university, in their exercise of academic freedom.

(f) On ***March 25, 2004***, Dean Barry gave an official reprimand to Dr. Mauguiere on the basis of an e-mail exchange between two colleagues other than Dr. Mauguiere and Dr. Ryon. Dr. Mauguiere was reprimanded for allegedly having "prompted a series of intimidating exchanges" between these two colleagues. Dr. Mauguiere did not initiate this exchange, had no over control of these two colleagues, and was not even aware of the exchange until after it had occurred. On July 1, 2004, Dean Barry informed Dr. Mauguiere that he was not willing to remove that letter of reprimand from her file.

(g) On ***June 4, 2004*** both Dr. Mauguiere and Dr. Ryon met with Dean Barry to

address both the issue of the reprimand given on March 25, 2004 and the hostile work environment in the Department. Dean Barry said that he would ask some people to stop bragging that they would "get their heads". He added that it was indeed easy "to cut off heads" (translation from French) if the Plaintiffs did not agree to his request to support his personal agenda at the CIEF.

(h) On ***July 2, 2004***, Dean Barry wrote to Dr. Ryon informing her that, beginning in the Fall of 2004, "any assignment of a graduate assistant to you will be monitored". Dr. Ryon had never been "monitored" in the past.

(i) On ***February 21, 2005***, the Defendant Leroy excluded Dr. Mauguiere from the Long Distance Learning Committee and the Curriculum Committee.

(j) Between ***2004 and 2008***, Dr. Mauguière and Dr. Ryon were removed by Dr. Leroy from most other departmental committees on which they traditionally served. Dr. Leroy has now removed the Plaintiffs from all departmental committees. Yet the Defendants Barry and Leroy have criticized the Plaintiffs for their purported lack of participation on departmental committees. In Dr. Mauguieres's 2006 Annual Performance Evaluation, Dr. Leroy stated that "Service is one of the most problematic aspects of Dr. Mauguiere's contribution to the Department".

(k) By the ***academic year 2005***, substantial changes had already been made to the teaching assignments of both Dr. Ryon and Dr. Mauguiere. Some of their classes were in the academic specialty the Plaintiffs were hired to teach, some of these classes had been reassigned to other faculty members, and the Plaintiffs' names had been removed from administrative documents distributed to graduate

students, in order to limit the Plaintiffs' participation in the graduate studies program. On February 28, 2005, Dr. Leroy, then new Chair of the Department, wrote to Dr. Ryon that "your minimal involvement in teaching and mentoring graduate students limits your usefulness to our graduate programs". However, two months later, Dr. Ryon received a letter of praise from the Dean of the Graduate School, Dr. C.E. Palmer, stating that her successful mentoring of doctoral graduate students is "above the average across campus. I wish to express my appreciation and that of UL Lafayette administration, for your hard work and continued dedication to graduate students and to the graduate enterprise. Well done! Thanks!"

(l) On ***July 14, 2005***, Dr. Serhane, a colleague, who the Defendants Barry and Leroy managed to turn against the Plaintiffs, wrote: "Fabrice, in response to your message, I believe it is necessary to attack the CIEF as a fraudulent, defamatory, and deceitful institution as well as the two witches who are hiding behind it. It is necessary to fight them from inside, at the level of the department and of the university."

(m) On or about ***August 22, 2005***, Dr. Abdelhak Serhane used a graduate student who worked under him to suggest to another graduate student, Nabila El Guennouni, that her graduate assistantship could be reinstated in exchange for her writing a negative report against Dr. Mauguière.

(n) Dr. Serhane wrote a virulent editorial in *Etudes Francophones*, the journal the Department of Modern Languages of UL-Lafayette, in the fall of 2005, against CIEF (International Council for Francophone Studies) whose members and

current officers were compared to "howling dogs", "false intellectuals", "insects", "sycophant of the masses and power driven" and "scum". Dr. Serhane was evidently particularly referring to the Plaintiffs, who were, at that time, the Executive Director and Secretary-Treasurer of CIEF. Dean Barry, Dr. Kocher and Dr. Leroy, who were all on the Board of Editors of this journal, not only endorsed these virulent attacks but disseminated them by sending copies to CIEF members as well as graduate students.

(o) On ***February 25, 2006,*** Dr. Mauguiere received the lowest performance evaluation of her career at ULL (IV), and the lowest category ever granted in the Department of Modern Languages for at least 16 years. In complete disregard of the excellence of Dr. Mauguiere's professional accomplishments in 2005, Dr. Leroy falsely reported and criticized Dr. Mauguiere's productivity, even though she consistently had the highest performance in the department.

(p) Dr. Barry and Dr. Leroy, along with Dr. Serhane and Dr. John Angell, attempted to persuade seven (7) students to write negative reports against the Plaintiffs.

(q) On ***May 2, 2006***, Dr. Kocher, wrote Vice-President Landry stating that: "As you know, our department's current Chairman (Dr. Leroy), former Chairman (Dr. Ancelet) and Dean (Dr. Barry), have amassed thick files of memos detailing a pattern of unethical behavior on the part of Dr. Benedicte Mauguiere." She also criticized the Plaintiffs for "filing a groundless harassment case against Dr. Leroy in 2003."

(r) Dr. Ancelet and Dr. Kocher, using their role as advisors and as Graduate Studies Coordinator, have systematically attempted to alienate students and persuaded

them not to do their graduate work under the Plaintiffs' supervision or to enroll in the Plaintiffs' classes.

(s) On or about ***October 25, 2006***, Dr. Leroy accused Dr. Ryon of "insubordination" in reprisal for her expressing a concern about his preventing an African-Caribbean woman from addressing faculty and students in the Department of Modern Languages. In response, Dr. Leroy stated in a letter "What is Dr. Ryon really contributing to our Department? I must wonder how long we can expect to run our already overstressed departmental engine with one (actually two) defective cylinder(s). Since Dr. Ryon recognizes no departmental authority here, I believe it is time for her administrative superiors to intervene in order to put an end to her disruption of the department".

(t) In ***February 2007***, both Dr. Ryon and Dr. Mauguiere were excluded from the Search Committee for hiring a new faculty in French (Africanist), despite their membership on the Personnel Committee (comprised of all tenured faculty members) as well as the fact that they were the two Senior faculty members with the most expertise in the field of the candidate. Dr. Mauguiere was excluded from the interview with candidate.

(u) In the ***Spring and Fall of 2007***, Dr. Mauguiere was removed from teaching her academic specialty at the graduate level. Instead she was assigned basic language classes and survey courses which is quite unusual for a faculty member of her rank. In Fall 2007, the graduate class in her field of specialization (Quebec literature) that she has been teaching for fifteen years was assigned to Dean Barry

(v) On ***March 1, 2007***, Dean Barry reprimanded Dr. Ryon for expressing her concern about Dr. Leroy's discriminating against one of the members of a visiting delegation.

(w) On ***March 5, 2007***, Dr. Leroy wrote a letter to Dr. Mauguiere to remind her "to lock the HLG 405 smart classroom after your Thursday evening class". Dr. Leroy added: "If you do not know how to lock the door, please ask Ms. Labiche for a demonstration". Dr. Mauguiere spoke with the custodians on the 4th floor, who confirmed that the two dates when the door was found open were during the week that Dr. Mauguiere was in India for a conference.

(x) On ***May 16, 2007***, Dr. Mauguiere reported to Dr. Leroy an incident with a colleague during which she was verbally abused and physically threatened. This colleague who had just been denied tenure, had been misinformed and misled about Dr. Mauguiere's position regarding his tenure, with the result of turning his resentment and anger against her. In fact, Dr. Mauguiere abstained on the vote on his tenure.

(y) On ***May 23, 2007***, Dr. Steve Landry, ULL Vice President met with both Plaintiffs, on their request, to discuss their concerns about the increasing violence in their workplace and the various forms of retaliation they were experiencing since their Grievance of 2003. Dr. Landry agreed to form an independent committee to investigate their allegations of professional harassment in the Department and stated that he was going to inform Dean Barry. This independent investigation never took place.

(z) On ***August 17, 2007***, the Plaintiffs received a letter from Dr. Leroy stating that

"serious allegations of professional misconduct and misuse of authority between a faculty member and a student have been lodged."

(aa) On ***August 18, 2007***, Dr. Mauguiere received a letter from Dean Barry questioning her professional responsibilities as both a faculty member of the university and an officer of the CIEF, and stating that "I consider you derelict of your professional duties as a faculty member in the Department of Modern Languages and insubordinate to its administration".

(bb) On ***August 22, 2007***, Dr. Kocher wrote an e-mail to the Defendants Leroy and Barry, describing herself as an "advocate" for the accusers of the Plaintiffs in the sexual harassment charge and seeking their advice and direction as to strategy of the sexual harassment investigation.

(cc) On ***September 6, 9, and 11, 2007***, the Plaintiffs received visits at their home from armed officers of the University Police delivering letters that could have been forwarded via Campus mail, the customary method of written communication at UL-Lafayette.

(dd) On ***September 20, 2007***, Defendant Leroy refused to sign and to forward to the Graduate Council Dr. Mauguiere's application for reappointment to graduate faculty status. Nevertheless, the application was successfully processed, and on November 14, 2007, Dr. Mauguiere received a letter from the Chair of the Graduate Council and the Dean of the Graduate School, Dr. C.E. Palmer, saying that "The Council's action reflects its recognition of your solid record of professional and academic achievement and its confidence in your continued scholarly productivity".

(ee) On ***September 22, 2007***, Dr. Serhane threatened the financial welfare of a graduate student, Didier Lenglare, and his wife in their home. Dr. Serhane warned the student that if he did not retract a letter of appreciation about Dr. Ryon and Dr. Mauguiere, which he wrote, and which was signed by a number of graduate students, his assistantship and the fellowship of his wife could be compromised.

(ff) In the ***fall and winter of 2007*** and the early part of 2008, the Defendants, Barry and Leroy, acting in concert with Dr. Kocher, assumed the positions of de facto managers of the investigation of the bogus sexual harassment charges against the Plaintiffs.

(gg) On ***September 23, 2007***, Dr. Kocher wrote to the Faculty Grievance Committee, which was considering preliminarily the sexual harassment charges against the Plaintiffs, in a deliberate effort to prejudice the committee against the Plaintiffs. About Dr. Mauguiere, she wrote "In my experience her actions and speech are unscrupulous, untruthful, scheming, power-grabbing, and malicious".

(hh) On ***October 31, 2007***, Dr. Ancelet also wrote directly to the Faculty Grievance Committee, in a deliberate effort to prejudice the committee against the Plaintiffs. His ex-parte communication clearly shows how the bogus sexual harassment charges are in fact being used as the latest, and most damaging step in Barry, Leroy and Ancelet's retaliatory campaign against the Plaintiffs. He acknowledged that his "knowledge of the issues of the current complaints is limited", but he took this opportunity to write a four page virulent negative report and along with a copy of another former negative report, and transmit both

documents ex parte to the FGC. Finally, he wrote that Dr. Mauguiere and Dr. Ryon “are convinced that they are invicible. The professional misconduct of these two faculty members has reached a critical point that can only be remedied by removal of tenure for cause”.

(ii) Dean Barry and Dr. Leroy, as well as Dr. Ancelet and Dr. Kocher, continuously made false allegations to the university administration and falsified public records to create a derogatory paper trail of allegations in order to carry our their plan to terminate the Plaintiffs. These allegations included, without limitation, the following written accusations: “violations of professional ethics”, “scheming”, “power-grabbing”, “malicious”, “unscrupulous”, “disingenuous”, “telling falsehoods”, “insulting”, “insubordination”, “intimidation”, “thirst for power”, “reprehensible”, “derelict in duties”, “giving bribes” and “hijacking”. These characterizations of the Plaintiffs are false and demonstrate the lengths to which Defendants Barry and Leroy, and Ancelet have gone to seek the termination of the Plaintiffs and the ruination of their careers.

16.

Neither the policing, monitoring or overseeing of, or reporting about the above referenced areas of public concern, nor the filing of the aforesaid grievances and complaints were required by nor within the Plaintiffs’ official job duties, as the Plaintiffs had no job duties requiring them to do these things.

17.

The retaliatory actions taken by the Defendants Barry and Leroy were harmful to the extent that they would dissuade a reasonable faculty member from filing a grievance raising public concerns at ULL.

18.

The Defendants Barry and Leroy are not entitled to qualified immunity from their acts because their conduct violated the Plaintiffs' clearly established First Amendment rights to petition for the redress of grievances and freedom of expression and to be from retaliatory conduct.[1] Moreover, their retaliatory conduct was not objectively reasonable.

19.

The strident allegations, which have been made against the Plaintiffs by the Defendants Barry and Leroy, along with Dr. Serhane and Dr. Kocher, stemming from the Plaintiffs' September 20, 2003 grievance, have never been heard or determined to be accurate by any quasi-judicial determination by the university or any impartial decision-maker.

20.

As a result of the retaliation by the Defendants, Barry & Leroy, the Plaintiffs have suffered severe mental and emotional injuries and loss of enjoyment of their personal and professional lives.

21.

The actions of the Defendants Barry and Leroy, as described herein above, are malicious and in reckless disregard of the Plaintiffs' federally protected rights. Therefore, the Plaintiffs seek punitive damages against those Defendants.

***COUNT II***

***DUE PROCESS***

22.

The FGC's "Statements" and "charges" (quoted above), as well as the relevant portions of the referenced documents, are vague, unspecific and overbroad, and do not provide Plaintiffs or any

---

1 *Rathjen v. Litchfield*, 878 F.2d 836 (5th Cir. 1959); *Varnado v. Department of Employment and Training*, (La.

reasonable person with sufficient, specific information to give them any reasonably specific sense or idea of what specifically they are expected to do or refrain from or are prohibited from doing. These rules, regulations, policies and provisions are void as unconstitutionally vague and overbroad, and are therefore unenforceable.

23.

As public employees and tenured university professors at ULL, Plaintiffs have a property right and interest in and to their employment, salaries, status and positions, and liberty interests in their good names, reputations, and freedom to work and earn a living. The Plaintiffs cannot be deprived of these rights and interests, except by due process of law in accordance with the Fourteenth Amendment to the United States Constitution, and Article 1, Section 2 of the Louisiana Constitution.

24.

The Plaintiffs enjoy both excellent and international professional reputations in their academic fields, and have substantial liberty interests in their good names and reputations. They should be protected from having to defend themselves against false and seriously stigmatizing charges under circumstances where the Defendants have repeatedly and intentionally refused to provide them with their fundamental due process rights.

25.

Further, pursuant to the provisions of LSA-R.S. 17:3101, et seq., the University of Louisiana at Lafayette is an "institution of higher learning", and Plaintiffs are "Member[s] of the faculty" of the University of Louisiana at Lafayette.

---

App. 1st Cir. 6/28/96), 687 So.2d 1013; _Johnson v. Louisiana Dept. of Agriculture_, 18 F. 3d 318 (5th Cir. 1994).

26.

Defendants' proposed termination of Plaintiffs is thus further governed by the provisions of LSA-R.S. 17:3101, et seq., and specifically, but not limited to, LSA-R.S. 17:3105, entitled Rules and regulations; tenure laws, which provides, by reference, that Defendants' proposed termination of Plaintiffs is governed by the Louisiana Tenure Law (LSA-R.S. 17:441, et seq.).

27.

LSA-R.S. 17:443 provides for and requires written and signed charges, which must include a complete and detailed list of the specific reasons for such charges, including, but not limited to the date and place of the alleged offense or offenses, names of individuals involved in or witnessing such offense or offenses, names of witnesses called or to be called to testify against the teacher at said hearing, and whether or not any such charges previously have been brought against the teacher. This provision further requires a hearing, where the teacher can appear and bring witnesses, as well as the right to compel, by subpoena, the attendance of witnesses on Plaintiffs' behalf.

28.

The Board is an "agency, and the proposed hearing is an "adjudication" within the meaning of the provisions of LSA-R.S. 49:550, et seq., the Louisiana Administrative Procedures Act. (APA).

29.

In addition to the other statutory requirements (referenced above), because the proposed hearing seeks to revoke tenured teachers' property rights and interests to continued employment, absent good cause, the proposed dismissal action requires prior notice and an opportunity for a hearing. As such, the Board's actions, as well as the proposed hearing must comply with the notice and hearing requirements contained in LSA-R.S. 49:555, which requires a hearing after reasonable notice, which notice must include at least: (1) a statement of the time, place, and nature of the

hearing, (2) a statement of the legal authority and jurisdiction under which the hearing is to be held, (3) a reference to the particular sections of the statutes and rules involved, and (4) a short and plain statement of the matters asserted.

***COUNT III***

***NOTICE***

30.

Both the Louisiana statutory provisions cited herein, as well as the federal and state due process requirements for the taking and deprivation of Plaintiffs' property interest and right in and to their tenured university employments, require at least the following:

1. Providing Plaintiffs with written notices, so as to advise them of the cause for the proposed terminations in sufficient detail, including the names and the nature of the testimony of the witnesses against them, the times, dates and places of all conduct or actions which form the basis of the termination actions, and any all rules, regulations, standards, directives or laws, which Plaintiffs are accused of violating, so as to enable Plaintiffs to fully and adequately understand the charges being brought against them, and to prepare and effectively assist counsel in their defense, and to show any error that may exist;

2. A meaningful opportunity to be heard in their own defense, before a tribunal that possesses some academic expertise and an apparent impartiality toward both Plaintiffs, their witnesses and the charges;

3. The opportunity at all hearings to cross examining witnesses, present evidence and be represented by counsel;

4. To have the hearing scheduled within a reasonable time period, which gives Plaintiffs adequate time to investigate the charges, including interviewing and arranging for the appearance of and/or subpoenaing witnesses, and otherwise adequately prepare for the hearing;

5. To have the hearing recorded in such a manner that the proceedings can be fully and adequately transcribed, so as to allow Plaintiffs the ability to appeal any adverse decision;

6. To be informed in writing of the final determination by the Board, its representatives and/or the decision maker(s), with a statement of the reasons and evidence relied upon to support its decision.

31.

Plaintiffs have not been provided with formal notices, which comply with due process and/or statutory requirements. The "charges", contained in the FGC's "Specifications" and March 25, 2008 "Statements", are mere generalizations, vague, nebulous, overbroad, incomplete, entirely conclusory and wholly inadequate. These "notices" do not contain or provide Plaintiffs with even a single specific detail, and do not specify the required facts on which Plaintiffs' proposed termination actions are to be based, nor do they provide the parameters of or in any way limit the dismissal proceedings or hearing to these charges. The "charges" completely fail to meet even the bare, minimal requirements of either the statutory or federal or state constitutional due process requirements, and the Board's proposed dismissal action in this regard deprives Plaintiffs of both their right to know, in detail, the nature and content of the charges and facts upon which the university's proposed action is based, as well as depriving them of an adequate opportunity to prepare and present an effective defense.

32.

On April 10, 2008, Dr. James Underwood, the Chairman of the FGC, after receiving one of the Plaintiffs' requests for specific notice of the charges, wrote: "The games continue. My inclination is to tell Ryon that I am not at liberty to provide her with the original letters of complaint as they are confidential and to be turned over to the ad hoc hearing committee. Nor am I at liberty to particularize the grounds for proposed dismissal beyond those in the jointly formulated statement provided to her on March 25, 2008. Please advise." This letter was transmitted ex parte to the AHHC.

33.

Indeed, on May 20, 2008, counsel for the university advised counsel for the Plaintiffs and

counsel for the AHHC that the university intends to expand charges by several notebooks of purported un-sworn documentary evidence, which has been written by the Defendants, and which has already submitted ex parte to the AHHC, without affording the Plaintiffs or their counsel the opportunity to object to any of this proposed evidence.

***COUNT IV***

***HEARING DATE***

34.

The June 16, 2008 hearing date does not satisfy the requirements of due process, because it does not give Plaintiffs adequate time to investigate these matters and "charges" and prepare for this hearing. Further, because the hearing was scheduled by the AHHC during the University's summer recess, many of Plaintiffs' witnesses, who are both material and necessary to Plaintiffs' defenses, are either not now available to Plaintiffs and/or will not be available on the date of the hearing, because they are not attending school or employed during the summer. In fact, many are out of the country during the summer break because they are international students.

35.

The AHHC has indicated that it would make every effort to attempt to provide for their presence at the hearing, but the AHHC has not offered to subpoena any of these witnesses. Moreover, the university has failed to provide the Plaintiffs with notice of the nature of the testimony of its proposed witness, in violation of the Plaintiffs' due process rights.

36.

Additionally, as is well known to the Defendants Barry and Leroy, and Dr. Steve Landry, Drs. Ryon and Mauguière are officers of the international professional organization Conseil International d'Études Francophones (CIÉF), and have had planned a long standing trip to travel to

the CIÉF annual conference Dr. Mauguiere had previously arranged to fly to France on June 18, 2008 to attend this conference. The Plaintiffs' attendance at and participation in this conference, including pre-convention meetings and organizational work preparatory to the conference, is both professionally prestigious and important to both Plaintiffs and the CIEF. The CIEF conference and pre-convention meetings will take place from June 25 through July 7, 2008. The Plaintiffs are obligated to stay in France until July 13, 2008 to wind up the business of the conference. The Plaintiffs are the officers of the organization who are principally responsible for organizing and running this conference and this conference will have to be cancelled if the Defendants cannot discharge their responsibility with regard to this convention. This conference is typically attended by 300-600 university professors and other participants including writers, scholars, critics, and journalists from every Francophone country and region in the world. In the event that this conference has to be cancelled because of the Plaintiffs' inability to attend, the persons who had planned to attend this convention will surely learn of the reasons for the convention's cancellation. Such a situation undoubtedly creates the potential for further irreparable damages to the Plaintiffs' reputation and career.

***COUNT V***

***HEARING PREPARATION***

37.

Plaintiffs have requested from Defendant, the FGC and/or other ULL administration staff, both informally in the routine course of this proceeding and formally under the Louisiana Public Records Law (LSA-R.S. 44:1, et seq.), documents which contain facts relevant to this matter, and which are vitally necessary to Plaintiffs understanding of the "charges", and necessary and material to their preparation of their defenses and their ability to adequately and effectively assist counsel in

their defense, including cross-examining witnesses who will testify in this matter on behalf of ULL. Copies of Plaintiffs' requests for documents are attached hereto and made a part hereof as Exhibit 5.

38.

By letters from counsel for the university, dated May 9, 2008, and May 16, 2008, Defendant, its FGC and ULL administration staff, refused to provide Plaintiffs with requested and necessary documents, or to comply with Plaintiffs' Louisiana Public Records Law requests. A copy of the May 9, 2008 and May 16, 2008 refusal letters are attached hereto and made a part hereof as Exhibit 6.

39.

Counsel for the university, subsequently provided the requested public records on May 22, 2008, but continued to refuse to provide any records of Plaintiffs' accusers, although the credibility of these accusers will be seriously at issue in the dismissal proceeding, and the Plaintiffs have reason to believe that their student records will contain evidence material to their credibility as well as evidence which should have caused the Defendants Barry and Leroy to seriously question their credibility. It is constitutionally necessary that plaintiffs have access to and are able to inspect any and all records in the possession, custody, or control of ULL on which ULL will rely in the dismissal hearing, and which are necessary to plaintiffs' preparation of their defense.

40.

Article 12, Section 3 of the Louisiana Constitution of 1974 provides that "No person shall be denied the right to examine public documents, except in cases established by law." Further, LSA-R.S. 44:1, et seq., the Louisiana Public Records Law, generally gives those who are interested in the conduct of public business the right to inspect and copy public records. LSA-R.S. 44:1 specifically provides that:

> [Except as otherwise provided in this Chapter or the Constitution of Louisiana, a]ll books, records, writings, accounts, letters . . .

> recordings, memoranda, and papers, or any other documentary materials, regardless of physical form or characteristics, having been used, being in use, or prepared, possessed, or retained for use in the conduct, transaction, or performance of any business, transaction, work, duty, or function which was conducted, transacted, or performed by or under the authority of the constitution or laws of this state . . . are "public records". . .

41.

LSA-R.S. 44:31 provides the general right to inspect, copy, or reproduce any public record (44:31B.(1)), as well as the duty of the custodian to provide access to the public records within their control. (LSA-R.S. 44:31A.).

42.

The Louisiana Public Records Law does not exempt student or educational records from the general provision making such records "public records".

43.

The Plaintiffs seek a declaratory judgment that, pursuant to 20 U.S.C.A. § 1232g, the Family Educational And Privacy Rights Act (FERPA), student records may be released, if they are material to a pending legal proceeding in accordance with 20 U.S.C. 1232g(b)(2)(B).

***COUNT VI***

***DISQUALIFICATION OF CHAIR AND MEMBERS OF THE AD HOC HEARING COMMITTEE AND OTHERS***

44.

The FGC has been deeply involved in this matter for many months, and has repeatedly discussed these matters and the facts surrounding them amongst themselves and with the complainants, witnesses and Dr. Suzanne Kocher. Dr. Kocher, a faculty member of the Department of Modern Languages, has coached the Plaintiffs' accusers, translated their statements which were

originally written in French, and Dr. Leroy has proposed that Dr. Kocher act as interpreter at the tenure hearing so as to enhance "their argumentation".

45.

Throughout the process by which the FGC gathered documents, information and ex parte statements, and, most importantly, recommended the present charges against Plaintiffs for a hearing, Plaintiffs were never invited, able or allowed to effectively participate in the FGC process, and Plaintiffs never had access to the full FGC, having only been interviewed by two FGC sub-committee members, who both had voted against Plaintiffs in the September 20, 2003 grievance proceeding.

46.

The "evidence", which was gathered by the FGC has now been entirely transmitted to the AHHC, triers of fact. Much, if not all, of this "evidence" is, at this point, un-sworn and not made on personal knowledge, even though it was written in such a manner as to lead the reader to believe that it is based on personal knowledge. As importantly, neither Plaintiffs nor their attorneys were present at the time this "evidence" was provided to and received by the AHHC, nor were they informed of this prior to that time, nor were Plaintiffs or their attorneys afforded an opportunity to object in whole or in part to any of this "evidence" being provided to or considered by the AHHC.

47.

Much of this evidence is false and would be extraordinarily prejudicial to any disinterested observer. The reception of this "evidence" by the AHHC gives it the appearance of partiality, has presumably poisoned and tainted the minds of the triers of fact and prejudiced them against the Plaintiffs, and would prevent any disinterested trier of fact from providing Plaintiffs with a fair and

impartial hearing and/or decision in this matter, which must have both actual impartiality *and* the appearance of impartiality.

48.

The receipt by the AHHC of these ex parte materials violates basic standards of fairness and trier of fact impartiality, as well as Plaintiffs' basic right to due process and a fair and impartial hearing and decision maker. Pursuant to the provisions of LSA-R.S. 49:960, and due process of law, the present members of the AHHC should be disqualified from participating in this hearing or decision.

49.

Additionally, the AHHC's ex parte receipt of the FGC documents and other "evidence" violates the provisions of LSA-R.S. 49:960, which prohibits a hearing or deciding officer or member from having such ex parte communications. This statute further provides that such hearing or deciding officer or member shall "withdraw from any adjudicative proceeding in which he cannot accord a fair and impartial hearing or consideration".

50.

The members of the AHHC have now become so involved in and knowledgeable of the facts of this matter that they are presumably irreparably tainted and prejudiced, so as to give the appearance of partiality, and, in light of the deliberate efforts of the ULL administration to poison and taint the AHHC, they presumably cannot and will not provide Plaintiffs with a hearing or decision with either actual impartiality or the appearance of complete impartiality.

51.

Dr. James H. Underwood, III, Chair of the FGC, has unilaterally removed and replaced one or more AHHC members. Dr. Underwood's statements during this process, both oral and written,

show a bias against Plaintiffs, and his actions in unilaterally removing and selecting AHHC members violates Plaintiffs' basic right to due process and a fair and impartial hearing and decision maker. Moreover, on April 29, 2008, Dr. Mauguiere attempted to challenge the selection of the Chair of the AHHC because of Dr. Mauguiere's belief that the Chair was a member of the ULL Administration and would have difficulty being completely impartial, but Dr. Underwood refused to allow her to do so, stating that only a member of the AHHC can challenge another member of the committee and that Dr. Mauguiere could not challenge the selection of any member of the AHHC.

52.

Dr. Suzanne Kocher has been personally and intimately involved in these matters, going back some years, and has been both an "investigator" and an advocate in pursuing these matters against the Plaintiffs. Dr. Kocher has also acted as translator for students and others in discussions, written correspondence and before the FGC and other ULL administration officials.

53.

Just one example of Dr. Kocher's false allegations, character assassination, and efforts to destroy the Plaintiffs' careers and reputations are contained in her September 23, 2007 letter to Dr. James Underwood, Chairman of the FGC, in which she states, in part, that:

> "In my experience her [Dr. Mauguière's] actions and speech are unscrupulous, untruthful, scheming, power-grabbing, and malicious" and "[Dr. Mauguière] has no sense of professional ethics."
>
> . . . .
>
> "In the past DR [Dr. Ryon] has attempted to make excuses for BM's [Dr. Mauguière] unprofessional behavior toward me. She [Dr. Ryon] has also been known to lie and cover up facts, especially when trying to protect her partner [Dr. Mauguière] from the consequences of their actions. On one occasion last summer, DR [Dr. Ryon] tried to bribe Salima [Benzohra, a complainant in these matters] to leave town ."

A copy of Dr. Kocher's letter is attached hereto and made a part hereof as Exhibit 7.

54.

Dr. Kocher's September 23, 2007 letter to Dr. Underwood and the FGC has been received by the AHHC, and that it is just one example of the un-sworn, prejudicial, falsified and inflammatory evidence that has been received by the AHHC ex parte.

55.

Plaintiffs understand that Dr. Kocher may have some official role in and/or serve as interpreter for witnesses during whatever hearings are held in this matter. Dr. Kocher is so knowledgeable of the facts of this matter, and is and has been so involved as an investigator, interpreter and advocate in these matters that she is irreparably tainted and prejudiced, so as to give the appearance of partiality, and that any role she may have in these hearings, including serving as a interpreter, cannot and will not provide Plaintiffs with a fair and impartial hearing. It is wholly inappropriate, unfair and prejudicial to Plaintiffs that Dr. Kocher have any official role, including translator, in any hearings that are held. Dr. Kocher should therefore be disqualified from any official role or from serving as interpreter in this hearing.

## ***VII. DECLARATORY RELIEF***

56.

This is a case of actual controversy within the jurisdiction of this court. Plaintiffs have certain rights and interests in and to their tenured employment at ULL, and have other legal relations with Defendant and ULL. Pursuant to the provisions of 28 U.S.C.A. § 2201, Plaintiffs desire and are entitled to have this court declare their rights and legal relations with the Board and ULL in this matter.

57.

Plaintiffs further seek a declaration by the court that the Conduct of the Board, referenced

herein, was and is violative of the Louisiana state statutes and constitutional provisions cited herein, as well as Plaintiffs' due process and other rights under the First and Fourteenth Amendments of the Constitution of the United States.

58.

Specifically, with regard to notice and hearing of their proposed dismissal by ULL , Plaintiffs desire the court to declare their rights with regard to their tenured employments at ULL, including their due process rights under the provisions of the Fifth and Fourteenth Amendments of the Constitution of the United States, and Article 1, Section 2 of the Louisiana Constitution of 1974.

59.

Plaintiffs further seek a declaration by the court that Plaintiffs' tenure and employment rights, including the proposed dismissal action, are governed by the provisions of LSA-R.S. 17:3101, et seq., and specifically, but not limited to, LSA-R.S. 17:3105, entitled Rules and regulations; tenure laws, as well as by LSA-R.S. 17:441, et seq. (the Louisiana Tenure Law), and that the conduct of the Board and the AHHC was and is violative of the referenced amendments to the United States Constitution and Louisiana Constitution and state statutes.

60.

Plaintiffs further desire and ask the court to declare that their rights to notice and an impartial and fair hearing, including impartial triers of fact and decision maker(s), are additionally governed by LSA-R.S. 49:950, et seq. (Louisiana Administrative Procedure Act).

61.

Additionally, as the Board has refused to provide requested ULL records, Plaintiffs ask the court to declare that, pursuant to LSA-R.S. 44:1, et seq., the Louisiana Public Records Law, as well

as their due process rights to a fair hearing, Plaintiffs are entitled to inspect and copy the requested records.

62.

With regard to some of the requested records, specifically ULL's student records, the Board has refused to produce these records based on the provisions of 20 U.S.C.A. § 1232g, the Family Educational And Privacy Rights Act (FERPA). Plaintiffs desire that the court declare that such records may be released and provided to Plaintiffs within this judicial proceeding, and to order the Defendants to produce those records.

## *VIII. JURY DEMAND*

63.

The Plaintiffs respectfully request trial by jury on all issues triable by jury.

## *VIX. PRAYER FOR RELIEF*

**WHEREFORE**, Plaintiffs, Dr. Dominique Ryon and Dr. Benedicte Mauguière, respectfully pray for judgment against the Defendants, Allen David Barry and Fabrice Leroy, in their personal capacities for compensatory and punitive damages for such sums as are reasonable in the premises, together with legal interest thereon from the date of judicial demand until paid;

**WHEREFORE**, Plaintiffs, Dr. Dominique Ryon and Dr. Benedicte Mauguière, further respectfully pray for judgment against all Defendants, in both their official and personal capacities, as follows:

1. Ordering the Defendants to pay plaintiff attorneys' fees and litigation expenses in accordance with 42 U.S.C. 1988;
2. For all costs of this proceeding; and
3. For any and all other or alternative relief allowed by law.

**RESPECTFULLY SUBMITTED:**

s/ J. Arthur Smith, III____________

**J. ARTHUR SMITH, III (Bar No. 07730)**
**NICOLE D. STREVA (Bar No. 30745)**
830 North Street
Baton Rouge, Louisiana 70802
Telephone: (225) 383-7716
Facsimile: (225) 383-7773
Email: j_asmith@bellsouth.net
nicolestreva@bellsouth.net
*Attorneys for Plaintiffs*
*Dr. Dominique Ryon and*
*Dr. Benedicte Mauguiere*